**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **BASSIL ABDELAL**<br> Plaintiff.<br><br>v.<br><br>**CITY OF CHICAGO,** a municipal corporation,<br>**OFFICER MIGUEL TORRES,**<br>**OFFICER ROLANDO RUIZ,**<br>**OFFICER THOMAS PETRENKO,**<br>**PAT CAMDEN,**<br>**THE TRIBUNE COMPANY**<br>Defendants. | Case No:  13-cv-01851<br><br>Judge Rebecca Pallmeyer<br>Magistrate Brown<br><br><br>**JURY DEMAND** |

## SECOND AMENDED COMPLAINT

NOW COMES Plaintiff BASSIL ABDELAL, by and through his attorney, London Law Offices, complaining of Defendants CITY OF CHICAGO and Defendants, MIGUEL TORRES, ROLANDO RUIZ, THOMAS PETRENKO, PAT CAMDEN and THE TRIBUNE COMPANY, and in support thereof, states:

### Parties

1.     Plaintiff Bassil Abdelal ("Abdelal")  is a citizen of Illinois and resides in Cook County, Illinois.

2.     Defendant City of Chicago is an Illinois municipal corporation, duly chartered and organized under the laws of Illinois, located within this judicial district.

3.     Defendant Miguel Torres, based on information and belief is a citizen of Cook County, Illinois and a sworn Chicago Police Officer who possessed the authority under law to carry out the police powers invested in him by Defendant City of Chicago.

4. Defendant Rolando Ruiz, based on information and belief, is a citizen of Cook County, Illinois and a sworn Chicago Police Officer who possessed the authority under law to carry out the police powers invested in him by Defendant City of Chicago.

5. Defendant Thomas Petrenko, based on information and belief, is a citizen of Cook County, Illinois and a sworn Chicago Police Officer who possessed the authority under law to carry out the police powers invested in him by Defendant City of Chicago.

6. Defendant Pat Camden, based on information and belief, is a citizen of Cook County, Illinois and the spokesman for the Chicago Fraternal Order of Police.

7. Defendant The Tribune Company does business and operates in the state of Illinois and is the publisher of the Chicago Tribune.

## Jurisdiction and Venue

8. The Court has federal subject matter jurisdiction and supplemental jurisdiction over the parties and claims pursuant to 28 U.S.C. §1332 and 28 U.S.C. §1367(a), respectively. Venue is proper pursuant to § 1391.

## Common Allegations

9. Plaintiff is the owner of a beauty supply store, B&B Beauty Supply, located at 5155 W. Lake Street in Chicago, Illinois.

10. On March 14, 2012 at approximately 8:30 pm, Plaintiff was getting ready to close his store and head home. He locked the main door at the store. A man knocked at the door and indicated he wanted to purchase barrettes. The Plaintiff tried to hand him the merchandise he wanted without letting him inside, but the man ran away. Plaintiff believes that it was a set up for Plaintiff just to unlock the door to enable the robbery described herein.

11.     Shortly thereafter, the man that ran away came back with a mask on his face along with two other masked men who stormed in the store.   Two of the three masked robbers pointed guns at Plaintiff and then they put a gun to his head and his father-in-law's head to try to knock them down and coerce them into doing what the robbers wanted.

12.     The robbers took Plaintiff's father in law, Khader Aruri, to the back of the store and kept asking him where the circuit breaker was and to turn off the main switch to the store so the electronic surveillance would be shut off.   After being shown the switch, one of the robbers shut off the electricity and kept Aruri laying down in the back of the store with a gun pointed at his head as while the other robbers pointed a gun at the Plaintiff's head  in the front of the store.

13.     The robbers were all screaming that if the Plaintiff or Aruri moved they would  be shot to death.  The Plaintiff and Aruri were very scared and terrified for their lives.  The Plaintiff was willing to do anything the robbers asked to do to save his life. While thinking about his family as his life flashed in front of him, the robbers demanded "Where is the cash, give us all the cash, open the cash register!" Plaintiff couldn't open the cash register because the electricity wasn't working.  Plaintiff told them that he could not open the register because the power was off, but the robbers were pushing the gun harder into Plaintiff's head forcing him to attempt to break it.   After two of the robbers saw Plaintiff trying but unable to open it they told the third robber at the back of the store who had a gun to Aruri's head to turn on the electricity on until Plaintiff  was able to open the register.  Aruri was able to turn on the electricity for one or two minutes.

14.  The register contained $160-$200.   The robbers were upset as they expected

much more than that. They started screaming "give more money or you be dead." Plaintiff told them that the money was at the back of the store in the washroom. Before the robbers went to get the money from the washroom one of the robber's cell phones rang. They answered and they were informed that the police were coming, based on belief, by a getaway driver, as apparently somebody called from the nearby Green line CTA station.

15.   The robbers got scared and panicked running in the store with a lot of anger. The Plaintiff was very afraid that the robbers would shoot Plaintiff and Aruri at any time because the robbers were angry that their plan did not work as planned.   The robbers ran away when they heard police arrive and Plaintiff saw one of the robbers drop their guns inside the store.   The Plaintiff stepped out of the door to see where the robbers were going so he could report it to the police.

16.   The Plaintiff saw a gun at the front of the door out side.  The Plaintiff picked it up for protection until the police arrived because he was terrified that the robbers would return and come back for him from the side or any where. The Plaintiff was standing right by the front door with the door open half of his body inside and the other half outside. The Plaintiff saw the police arriving in the parking lot outside the store. Feeling relieved that the police were present for protection, he immediately threw the gun down to the ground and did not point it at any one.

17.   After the police saw Plaintiff drop the gun to the floor, they opened fire at him and shot Plaintiff in his leg.  The Plaintiff ran back in side and was screaming "don't shoot I am the store owner."  The police kept on shooting even after the plaintiff had fallen to the ground.  At no time, did the police ever warn the Plaintiff to show or point

his hands up and/or lay on the ground or give a warning they would shoot. In the process of shooting the Plaintiff repeatedly, the police also shot out the glass in the store windows and glass door causing substantial property damage.

18. Plaintiff was shot and seriously wounded with 11 bullets to his hands, shoulder, toes, legs, and hips. One bullet almost his Plaintiff's head but it passed by Plaintiff's head and hit the cash register. Plaintiff was bleeding profusely. Aruri was very scared and thought that Plaintiff would die. Aruri ran to get something to rap Plaintiff's leg because it was shooting blood everywhere. The police ran into the store and the Plaintiff laying down in a pool of blood asked them, in an extremely weak state, why they shot the owner. The police did not answer, did give any care, and they stopped Aruri from even touching Abdelal and providing care.

19. Based on information and belief, the police also shot and wounded all three robbers who fled from and away from the store at a later time after shooting the Plaintiff even though the robbers did not have any guns on their persons when shot and never pointed any guns at the police since they had been dropped in the store and right outside the entrance of the store as they fled before the police arrived.

20. The police then handcuffed the Plaintiff even while he was injured and bleeding from his arms and legs. The Plaintiff started to feel excruciating pain. When Plaintiff got into the ambulance the detective was asking Plaintiff "Where is the gun?" and Plaintiff answered that he had no guns. He was transported by ambulance to Mount Sinai Hospital in Chicago, Illinois where the police placed the robbers who had been shot in the same hospital room as him causing plaintiff further severe fear and emotional anguish. Plaintiff was in excruciating physical pain as well. The police and detectives,

including, based on information and belief, Detective J.C. Morales, were hostile towards the Plaintiff at the hospital. They kept harassing and asking Plaintiff where his gun was while Plaintiff agonized in extreme pain. The Plaintiff kept answering them that he did not have any, to please leave him alone, and that Plaintiff wanted to get help to stop his pain.

21.     In the very early morning at the hospital while Plaintiff was resting and laying in bed while heavily medicated for all the pain from the bullets lodged in plaintiff at Sinai Hospital, Chicago police came, and handcuffed the Plaintiff to the bed arms. The Police knew or had reason to know that the Plaintiff was a crime victim given he was the store owner, had identified himself several times as such, had been held at gunpoint by three robbers which the police had shot beforehand, and in fact identified as the victim in police reports. The next day plaintiff's wife had plaintiff transferred to Advocate Lutheran General Hospital in Park Ridge, Illinois.

22. Throughout the entire week, detectives, who based on information and belief, were Asa Kim Ward and Detective Gilger, came back and forth asking Plaintiff and his family questions even though they knew Plaintiff could not talk coherently and was heavily medicated at the hospital.

23. At no time did the Plaintiff ever point a gun at the police or robbers, ever shoot a bullet at the police or robbers, ever own a gun, ever chase the robbers, or ever try hurt anyone. The Plaintiff saw that the robbers who fled also never aimed a gun or fired any guns at the police while fleeing from the store. In fact, he saw them drop their guns while fleeing. Plaintiff's only concern was to protect himself and survive until help arrived.

24. The Plaintiff sustained serious gunshot wound injuries that caused permanent harm to the Plaintiff as they required screws and a metal rod to be inserted in his left leg.

25. The City of Chicago, by and through its agents and Officers, tried to cover-up and hide the fact that they shot the wrong person and that they used excessive deadly force against Plaintiff who did not pose any threat to them.  Contrary to an article that was published in the Chicago Tribune on March 15, 2012, that falsely indicated that the officers responded to gunfire at the scene and the plaintiff was firing at the robbers, there had been no gunfire that occurred other than the police gunfire.  In particular, the robbers had already fled before the police arrived and the robbers had dropped their guns before they fled making gunfire impossible and the plaintiff never fired at the robbers.  Moreover, Aruri called Abdelal's brother in law, Hassan Saleh, who came to the store a after the ambulance transported Abdelal to the hospital.  Based on information and belief, a Chicago PD Officer told Saleh that both guns recovered on the ground from the scene had never been fired[1].

26. Outside video surveillance captured the guns laying right outside the store.  If in fact the robbers had aimed guns and fired at the police as the City of Chicago reported, the video surveillance would have shown them shot and laying on the ground near where the guns where.  Based on information and belief, the robbers were shot by the police blocks away from the store.  None of the Plaintiff's bullet wounds were caused by the robbers nor were any of the robber's bullet wounds caused by the Plaintiff.

---

[1] The crime scene report also support the fact that the two non-police guns recovered had not been fired.
[2] Such "code of silence" has already been determined to exist pursuant to the trier of fact holdings in Obryka v. Abbate, 07-cv-2372.

27.   The City of Chicago followed its "code of silence[2]" to protect and cover up the gross misconduct of Officers Torres, Ruiz, and Petrenko who fired eleven bullets into Plaintiff who was unarmed, did not aim any gun at the police, did not fire at the police, and posed no threat to the police.   The Officers also knew that none of the robbers ever aimed any guns or fired any bullets at the police.  In fact, not only did the robbers not have weapons on their persons when they were shot, but based on information and belief, one or both of the robbers' guns recovered at the scene on the ground in front of the store had never been fired. The Officers violated police department procedures and protocols for using deadly force.

**COUNT I**
**EXCESSIVE FORCE**
**VIOLATION OF 42 U.S.C. §1983**
**(against City and Defendant Officers)**

1-27. Plaintiff re-alleges and reincorporates paragraphs 1 through 27 as if fully set forth herein.

28.   The Defendant Officers who shot the plaintiff were acting under color of state law at the time they decided to use deadly force.

29.   At all times material hereto, Defendant  Officers had a legal duty to use only that amount and degree of force in the apprehension of suspects as was reasonable under the circumstances, for proper and efficient arrest, supervision and control of such persons.

30.   Without regard to who they were shooting at, Torres, Ruiz, and Petrenko, fired more than a dozen bullets at Plaintiff.   The Plaintiff did not aim any gun at the Officers nor was he disregarding any police commands as none were given to him.

---

[2] Such "code of silence" has already been determined to exist pursuant to the trier of fact holdings in Obryka v. Abbate, 07-cv-2372.

31. Abdelal was entitled to and had a right to be protected from excessive force used by the police. The degree of force used was far more than *de minimis* and not justified because Abdelal did not resist arrest, disregard any police orders, or pose an imminent threat of harm to the police.

32. Abdelal was unarmed when he was shot at more than a dozen times and did not threaten or make any threatening or furtive gestures to justify the excessive force used especially since the Plaintiff was partly inside the store with his hands in plain view while the officers stood outside and away approximately 60 to 70 yards from the store. Abdelal had not and was not committing a crime at the time of arrest, did not pose an immediate threat to the safety of officers, or others nor was he actively resisting arrest or attempting to evade arrest by flight.

33. Abdelal sustained severe bullet wound injuries to his hands, legs, toes, and arm as well as suffering excruciating pain and suffering as a direct and proximate result of the excessive force when he was hit with eleven bullets. Abdelal walks with a permanent limp and has recurring nightmares, anxiety, emotional anguish, and panic attacks.

34. The Officers acted with a reckless indifference to Abdelal's constitutional rights. The Officers' conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known.

WHEREFORE, Plaintiff prays for judgment against the City of Chicago and Officers Torres, Ruiz, and Petrenko as follows:

    A. Compensatory damages of at least $50,000,000.
    B. Punitive damages to be determined at trial.
    C. Reasonable attorneys fees 42 U.S.C. § 1988 and court costs.
    D. Any other relief that this court deems just and equitable.

## COUNT II
## FALSE IMPRISONMENT
### (against City and Defendant Officers)

1-27.    Plaintiffs re-allege and reincorporate paragraphs 1-27 as paragraphs 1-27 of this Count II.

35.    Abdelal's personal liberty was unreasonably and unlawfully restrained against his will.

36.    Abdelal had not threatened himself or others nor had he violated any law that justified his restraint.

37.    The Chicago Police intended to restrain Abdelal in the store, in the ambulance, and in the hospital after Abdelal had been shot eleven times.

38.    The Chicago Police knew or had reason to know that Abdelal was not a threat as Abdelal complied with all orders, identified himself as the store owner, did not aim a gun at the Police, did not possess a gun, or fire at the police.

39.    The Defendants caused and procured Abdelal's restraint.  To wit, the Chicago Police detained him against his will without probable cause.

40.    Abdelal had not committed any crime that justified his arrest and restraint.

41.    The Chicago Police handcuffed Abdelal to the hospital bed, in the ambulance, and in the store.

42.    Abdelal attempted to demand his release from police detention in store, operating by and through their duly authorized agents, servants, and employees, but his release was refused despite the fact he lay in pool of blood, Aruri told the police he was the owner of the store, and had no weapons on his persons.  In fact, the police would not let Aruri try to attend to Abdelal's gun shot wounds.

43.    The false imprisonment proximately caused damages including, but not

limited to, great mental anguish, humiliation, and shock to Abdelal.

WHEREFORE, Plaintiff prays for judgment against the City of Chicago and the arresting Officers as follows:

    A.  Compensatory damages to be determined at trial.
    B.  Punitive Damages.
    C.  Reasonable attorneys fees and court costs.
    D.  Any other relief that this court deems just and equitable.

**COUNT III**
**BATTERY**
**(against Defendant Officers)**

1-27.  Plaintiff Abdelal re-alleges and reincorporate paragraphs 1-27 as paragraphs 1-27 of this Count III.

44.  The Officers intended to shoot, hit, and kill Abdelal with each of the bullets that the fired at him.

45.  The Officers engaged in an unlawful harmful offensive touching of Abdelal. At the time of the offensive touching, Abdelal had not and was not committing a crime, did not pose an immediate threat to the safety of the Officers or others nor was Abdelal actively resisting arrest or attempting to evade arrest by flight.

46. The Officers' touching by hitting Abdelal with eleven bullets was not privileged because Abdelal had not resisted arrest, did not pose any threat, and was in full compliance

47. Abdelal sustained severe injury and wounds to his hands, arms, toes, and legs as well as severe pain and suffering as a direct result of the harmful and offensive touching from the fired bullets.

WHEREFORE, Plaintiff Abdelal prays for judgment against the City of Chicago, Miguel Torres, Rolando Ruiz, and Thomas Petrenko.

A. Compensatory damages of at least $50,000,000
B Punitive damages to be determined at trial.
C. Reasonable attorneys fees and court costs.
D. Any other relief that this court deems just and equitable.

## COUNT IV
## ASSAULT
### (against Defendant Officers Torres, Ruiz, and Petrenko)

1-27.   Plaintiff Abdelal re-alleges and reincorporate paragraphs 1-27 as paragraphs 1-27 of this Count IV.

48.   The Officers intended to shoot, hit, seriously injure and/or kill Abdelal with each of the bullets that they fired at him.

49.   The Officers intended to cause a harmful offensive touching and intended to cause and in fact did cause Abdelal a reasonable apprehension of an imminent contact with the fired bullets.   The Officers had the ability and in fact did effectuate the offensive contact by shooting at Abdelal more than eleven times.

50.  At the time of the offensive touching, Abdelal had not and was not committing a crime, did not pose an immediate threat to the safety of the Officers or others, did not aim a weapon at the Officers, nor was Abdelal actively resisting arrest or attempting to evade arrest by flight.

51. Abdelal sustained severe emotional distress and pain and suffering as a result of the apprehension and fear of the imminent contact from the fired bullets that led to severe injuries and wounds to his hands, arms, toes, and legs.

WHEREFORE, Plaintiff Abdelal prays for judgment against the City of Chicago, Officers Miguel Torres, Rolando Ruiz, and Thomas Petrenko as follows.

A. Compensatory damages of at least $50,000,000
B. Punitive damages to be determined at trial.

C. Reasonable attorneys fees and court costs.
D. Any other relief that this court deems just and equitable.


## COUNT V
## NEGLIGENCE
### (against Defendant Officers)

1-27.   Plaintiff Abdelal re-alleges and reincorporate paragraphs 1-27 as

paragraphs 1-27 of this Count V.

52.   The Officers that shot Abdelal owed a duty of care to Abdelal to use only

that degree of force that was reasonable under the circumstances and to attempt to

ascertain whether Abdelal was a victim or suspect before firing more than eleven rounds.

Given that the Officers intended and in fact did use deadly force, the Officers owed a

duty to warn Abdelal to put his hands up and/or lay to the ground to at least give Abdelal

a chance to "surrender" to alleviate any concerns that Officers had that he was a suspect.

53.   Given that no weapons were aimed at the Officers, no bullets were fired at the

Officers, no guns were aimed at the Officers, no threats were made against the Officers

there was no gunfire at any time prior to the arrival of the Officers, and no furtive

movements were made, the Officers use of deadly force was unreasonable especially as

they were 60 to 70 yards away.

54.   The Officers breached their duty of care by using excessive and deadly force

by failing to warn Abdelal and firing more than eleven bullets at Abdelal, who did not

pose any imminent threat to the Officers, did not aim any weapon at the Officers, and did

not refuse to comply with any orders thus acting with conscious disregard for his safety.

55.   The Officers' firing of bullets at Abdelal was not privileged because Abdelal

had not resisted arrest, had not aimed any weapons at them, did not pose any imminent

threat, and was an innocent victim of a robbery.

56. As a direct and proximate result cause of the Officers' breach of duty, Abdelal sustained severe injury and wounds to his hands, arms, toes and legs as well as severe pain and suffering from the fired bullets.

WHEREFORE, Plaintiff Abdelal prays for judgment against the City of Chicago and Officers Miguel Torres, Rolando Ruiz, and Thomas Petrenko as follows:

A. Compensatory damages of at least $50,000,000
B  Punitive damages to be determined at trial.
C. Reasonable attorneys fees and court costs.
D. Any other relief that this court deems just and equitable.

### COUNT VI
### WILLFUL AND WANTON CONDUCT
### (against Defendant Officers)

1-27.   Plaintiff Abdelal re-alleges and reincorporate paragraphs 1-27 as paragraphs 1-27 of this Count VI.

57.   The Officers that shot Abdelal owed a duty of care to Abdelal use only that degree of force that was reasonable under the circumstances and to attempt to ascertain whether Abdelal was a victim or criminal before firing more than eleven rounds.  Given that the Officers intended and in fact did use deadly force, the Officers owed a duty to warn Abdelal to put his hands up and/or lay to the ground to at least give Abdelal a chance to alleviate any concerns that Officers had that he was a threat.

58.   Given that no weapons were aimed at the Officers, no bullets were fired at the Officers, there was no gunfire at any time prior to the arrival of the Officers, no gunfire from anyone other than the Officers, and no furtive movements were made, the Officers use of deadly force was unreasonable especially as they were approximately 60 to 70 yards away from the store.

59.   The Defendant Officers acted with deliberate intent to harm, and/or acted with an utter indifference to, or conscious disregard for, the safety of Abdelal and any other citizens in the vicinity.   The Officer knew that firing bullets at Abdelal could serious injure or kill him and anyone else, including any customers or others that could have been in the store.   The Officer's conduct was willful and wanton.

60.   The Officers breached their duty of care by using excessive and deadly force by failing to warn Abdelal and firing more than eleven bullets at Abdelal, who did not pose any threat to the Officers, did not aim any weapon at the Officers, and did not refuse to comply with any orders thus acting with conscious disregard for his safety.

61. The Officers' firing of bullets at Abdelal was not privileged because Abdelal had not resisted arrest, had not aimed any weapons at them, did not pose any imminent threat, and was an innocent victim of a robbery.

62.   As a direct and proximate result cause of the Officers' breach of duty, Abdelal sustained severe injury and wounds to his hands, arms, toes and legs, severe pain and suffering from the fired bullets, as well as severe mental anguish and distress.

WHEREFORE, Plaintiff Abdelal prays for judgment against the City of Chicago and Officers Torres, Ruiz, and Petrenko as follows:

A. Compensatory damages of at least $50,000,000
B Punitive damages to be determined at trial.
B. Reasonable attorneys fees and court costs.
D. Any other relief that this court deems just and equitable.

## COUNT VII
## UNLAWFUL DETENTION
## VIOLATION OF 42 U.S.C. §1983
### (against City and Defendant Officers)

1-35.   Plaintiffs re-allege and reincorporate paragraphs 1-27 and paragraphs 36-

43 of Count II as paragraphs 1-35 of this Count VII.

63. The City of Chicago Officers who arrested and placed handcuffs on the Plaintiff at his store were acting under color of state law at the time they detained Abdelal who was already bleeding profusely from being shot eleven times.

64. The Officers imposed force on Abdelal to restrain his freedom of movement though Abdelal did not resist arrest and there was no probable cause for his detention. To wit, Abdelal did not commit a crime nor did he pose a safety threat to himself or others and identified himself as the store owner.

65. Plaintiff Abdelal was unlawfully detained against his will by putting handcuffs on him and chaining him inside the store, in the ambulance, and in the hospital against his will in violation of his federally protected rights under 42 U.S.C. §1983.

66. In committing, the acts alleged in the preceding paragraphs, the Officers were members of the City of Chicago, acting at all relevant times within the scope of their employment. Their conduct violates clearly established statutory or constitutional righs of which a reasonable person would have known.

67. As a direct and proximate result of the conduct of the Officers, Abdelal suffered pain, harm, and damages.

WHEREFORE, Plaintiff Abdelal prays for judgment against the City of Chicago and Defendant Officers as follows:

A. Compensatory damages to be determined.
B. Punitive damages to be determined at trial.
C. Reasonable attorneys fees under 42 U.S.C. § 1988 and court costs.
D. Any other relief that this court deems just and equitable.

**COUNT VIII**
**MONELL CLAIM AGAINST CITY OF CHICAGO**
**42 U.S.C. § 1983**

1-27.    Plaintiffs re-allege and reincorporate paragraphs 1-27 as paragraphs 1-27 of this Count VIII.

68.    The City of Chicago, by and through its appointed policy makers, knew that it was clearly established mandate not to violate a citizens' federally protected rights. To wit, the City of Chicago policy makers knew that it was unlawful to use excessive force in making arrests and to unlawfully detain individuals without probable cause.

69.   The City of Chicago, by and through its Officers, turned a blind eye to the clearly established Fourth and Fourteenth Amendment mandates against seizure without probable cause which are plaintiff's constitutional rights and which a reasonable person would have known.  The Officers personally used excessive force that showed deliberate indifference to the federally protected rights of Plaintiff.

70.   The City of Chicago is liable for the various constitutional violations of the Officers because the City of Chicago delegated to the Officers the final-decision making power as to whether to use excessive force and whether to detain and arrest Abdelal at his store, in the ambulance, and hospital with handcuffs without probable cause given the City of Chicago knew or had reason to know that Abdelal was the store owner, an innocent victim of an armed robbery, and a victim of excessive and deadly force used by the police officers.

71. The actions of the Defendant Officers were done pursuant to one or more of the following *de facto* policies, practices, and/or customs of the City that are so pervasive that they carry the force of law.  Specifically, the City has a de facto policy, practice, and/or custom of concealing and/or suppressing officer misconduct including the use of unlawful and excessive force.  The concealment and suppression of the existence of misconduct includes, but is not limited to: failure to sufficiently investigate allegations of

misconduct, failure to properly and sufficiently discipline an officer; failure to promptly record witness statements or preserve evidence; fabrication of exculpatory evidence or destruction of evidence; and failure to initiate prompt disciplinary procedures related to the alleged misconduct, even when the allegation of misconduct is so obviously true.

72. The City of Chicago has a *de facto* policy, practice, and/or custom of hiring and retaining unqualified officers, and failing to properly train, monitor, and/or supervise its police officers. Moreover, the City of Chicago failed to properly train Officers Torres, Ruiz, and Petrenko in the proper use of use of deadly force.

73. The City has *de facto* policy, practice, and/or custom of a "code of silence." This code is an implicit understanding between and among members of the CPD resulting in a refusal or failure to report instances of misconduct of which they are aware, including the use of unlawful force, despite their obligation to do so as sworn peace officers. This includes police officers who remain silent or give false or misleading information during official investigations into allegations of a fellow officer related to misconduct that occurred on duty or off duty in order to protect themselves or their fellow officers from discipline, criminal prosecution, or civil liability. By way of example, much of the information reported to the media regarding the shooting was fabricated to cover up the excessive force used and protect the Officers and City.

74. Individually and collectively, the above described *de facto* policies, practices, and/or customs of the City of Chicago proximately result in the culture and endemic attitude among members of the CPD, including Officers Torres, Ruiz, and Petrenko, that may engage in misconduct, and in particular, the use of unlawful and excessive force, against the citizenry with impunity, and without fear of official consequence.

75. The aforementioned *de facto* policies, practices, and/or customs of the City of Chicago, individually and collectively, but have been maintained and/or implemented with utter indifference by the City of Chicago and has or have encouraged and/or motivated the Defendants, Officers Torres, Ruiz, and Petrenko, to commit the aforesaid wrongful acts against the Plaintiffs, and therefore acted as the direct and proximate cause of the injuries sustained by the Plaintiff.

76. The above acts of the City violated the Plaintiff's rights under Fourteenth Amendments to the U.S. Constitution and as direct result of the facts and allegations set forth, Abdelal has suffered and will continue to suffer injuries of a personal and pecuniary nature, including extreme emotional distress and damage to his business and property.

WHEREFORE, the Plaintiff demands judgment against the City of Chicago, in an amount in excess of $20,000,000 plus costs, attorneys fees, and any other relief the Court deems just and equitable.

## COUNT IX
## CONSPIRACY
## 42. U.S.C. §1985(2)
### (against Defendant Officers)

1-36. Plaintiff re-alleges and reincorporates paragraphs 1-27 and paragraphs 68-76 of Count VIII as paragraphs 1-36 of this Count IX.

77. The individual Defendant Officers Torres, Ruiz, and Petrenko, acting together and under color of law, reached an understanding and agreement, engaged in a course of conduct, and otherwise conspired among and between themselves and with other unnamed and/or as yet unknown co-conspirator, to intimidate and harass the Plaintiff after he was shot and cover up the Officer's misconduct of using excessive force

by making and portraying the Plaintiff to be the criminal and perpetrator when they knew or had reason to know he was the store owner and a victim of a crime.

78.    As the proximate result of the intimidation and harassment described herein, the Plaintiff has suffered and will in the future continue to suffer injuries of a personal and pecuniary nature.

WHERERFORE, the Plaintiffs demands judgment against the Defendants, joint and severally in a sum in excess of $50,000,000, including punitive damages, plus costs, attorneys' fees, and any other relief the Court deems just and equitable.

## COUNT X
## INDEMNIFICATION
## 735 ILCS 10/9-102

1-27.    Plaintiff re-alleges and reincorporates paragraphs 1-27 as paragraphs 1-27 of this Count X.

79.    Defendant Officers Torres, Ruiz, and Petrenko were employees and agents of the City of Chicago and acted within the scope of employment in committing the misconduct described herein.

80.    Defendant City of Chicago is a municipal corporate required to provide indemnity pursuant to 735 ILCS 10/9-102 for all actual damages caused by the Defendant Officers Torres, Ruiz, and Petrenko, caused while acting in the scope of their employment.

WHEREFORE, Defendant City of Chicago is liable to Plaintiff for an amount which will compensate them for past and future damages, including but not limited to Plaintiffs' pain, suffering, emotional distress, and property damage to their business and property caused by the unlawful acts of the Defendant Officers.

## COUNT XI
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (against Defendant Officers)

1-33.    Plaintiff re-alleges and reincorporates paragraphs 1-27 and paragraphs 57-62 of Count VI as paragraphs 1-33 of this Count XI.

81.   The police officers owed plaintiff a duty of care to not shoot the plaintiff, an innocent robbery victim.  In particular, the police owed a duty to attempt to give the plaintiff who did not pose any threat of harm an opportunity to "surrender" by giving orders to lie on the ground and/or any other precautionary orders.   They owed a duty to secure the area without putting innocent victims in harms way and to ascertain or investigate who might be innocent before firing.

82.   The police breached this duty by firing over a dozens bullets at the plaintiff when they knew or had reason to know that Abdelal was a victim and the store owner.  In particular, even if they suspected he was one of the robbers, they breached their duty of care to give him an opportunity to "surrender" before shooting him and/or attempting to ascertain who he was.

83.   As a direct and proximate of their breach, the plaintiff has sustained severe physical injuries.  Consequently, as a result of the physical impact of the bullets, the plaintiffs has sustained severe emotional anguish and distress.

WHEREFORE, Plaintiff Abdelal prays for judgment against the City of Chicago and Defendant Officer Torres, Ruiz, and Rolando as follows:

      A. Compensatory damages to be determined at trial.
      B. Punitive damages to be determined at trial.
      C. Reasonable attorneys fees and court costs.
      D. Any other relief that this court deems just and equitable.

## COUNT X
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (against Defendant Officers)

1-33.   Plaintiff re-alleges and reincorporates paragraphs 1-27 and paragraphs 57-62 of Count VI as paragraphs 1-33 of this Count X.

84.   The police officers intended and/or knew there was a high probability that placing the robbers--the same robbers that had put a gun to the plaintiff's head--in the same hospital room as the victim plaintiff would cause plaintiff severe emotional distress. The officers placed the robbers in the same room as the plaintiff because they wanted to treat the victim as a suspect so that they could try and cover up their gross misconduct by falsely claiming and making it appear that they thought he was a robber.   The officers also handcuffed the plaintiff in the store, ambulance, and hospital bed to also treat him like a criminal knowing there was a high probability that it would cause plaintiff severe emotional distress given they had just shot, seriously injured, and attempted to kill an innocent and victimized store owner.  In addition and in alternative in Count XI, plaintiff alleges that the officers intended to cause plaintiff, the store owner and an innocent crime victim, severe emotional distress by firing more than eleven bullets at him.

85.   The police officer's conduct was extreme and outrageous in degree as to go beyond all bounds of decency and to be unacceptable in a civilized society.

86.   The officers could not reasonably believe that their objective was legitimate as the plaintiff identified himself numerous times as the store owner and in fact was the store owner.  There would be no objective in putting a victim in the same room as the criminals who robbed him at gunpoint or handcuffing him especially when he had been seriously injured from being shot eleven times.  In addition, the police officers knew or should have known that the victim was already particularly susceptible to emotional

distress given he had just been a victim of an armed robbery and a victim of being shot eleven times despite identifying himself as the store owner.

87.    As a direct and proximate result of the officers' conduct, the plaintiff in fact has sustained severe emotional distress including ongoing fear, terror, and anguish.  The plaintiff is fearful of the police given the police officers who were sworn to serve and protect did everything they could to treat him like a criminal.

WHEREFORE, Plaintiff Abdelal prays for judgment against the City of Chicago and Defendant Officers as follows:

      A. Compensatory damages to be determined at trial.
      B. Punitive damages to be determined at trial.
      C. Reasonable attorneys fees and court costs.
      D. Any other relief that this court deems just and equitable.

## COUNT XII
## DEFAMATION

### (against Defendants Pat Camden and The Tribune Company)

1-27.    Plaintiff re-alleges and reincorporates paragraphs 1-27 of this Count XII.

88.    On March 15, 2012, the Chicago Tribune published an article based, in part, on what Pat Camden told them[3]:

> [The officers] were met by shots being fired as three armed offenders were leaving the store, next to the CTA Green Line's Laramie station.

> A spokesman for the police union said the clerk had been firing at the robbers…Four officers arriving at the scene heard gunshots from inside the business, then saw the three masked men carrying handguns fleeing outside, Camden said. Behind them was a fourth man, later determined to be the store clerk, firing shots at the fleeing men, Camden said.  The cops, not knowing who the aggressor was, returned fire as shots rang out as the three armed men were leaving the store, Camden said.

---

[3]    See    http://articles.chicagotribune.com/2012-03-15/news/chi-paramedics-called-to-austin-neighborhood-where-at-least-1-person-reportedly-shot-20120314_1_clerk-shot-police-officers-police-involved-shootings.

(See **Exhibit 1**.)

89. Camden's statements were unprivileged, false, and made in reckless disregard of the truth and constitute slander per se.  In particular, the plaintiff, the store clerk, did not fire shots at any time at the fleeing men or anyone else nor were the police met with any bullets by either the plaintiff or the robbers.   The police also did not hear gunshots inside the business as no guns were ever fired by the plaintiff or the robbers.   In fact, in no police report does it state that the plaintiff or robbers fired any guns.

90.  Camden falsely imputed that the plaintiff engaged in a criminal act of aggravated assault with a deadly weapon, reckless endangerment of human life, and/or attempted murder.   Consequently, in the alternative, plaintiff asserts that Camden's statements are slander per quod.

91.  The Chicago Tribune published the article in reckless disregard for the truth without making any due diligent attempt to verify and check the facts other than what Pat Camden told them. The Chicago Tribune published Camden's false and defamatory statements about the plaintiff without performing a reasonable investigation into the facts, including the police reports themselves, which are contrary to what was published.

92.  As a direct and proximate result of Camden's false statements, the plaintiff in fact has sustained harm to his reputation as he is a non-violent person and has sustained severe emotional distress.

WHEREFORE, Plaintiff Abdelal prays for judgment against the The Tribune Company and Defendant Camden as follows:

A.  Compensatory damages to be determined at trial.
B. Punitive damages to be determined at trial.
C. Reasonable attorneys fees and court costs.
D. Any other relief that this court deems just and equitable.

**PLAINTIFFS DEMAND A JURY**

Respectfully Submitted

BASSIL ABDELAL

_____
Plaintiff's Attorney

Justin London
LONDON LAW OFFICES
1920 N. Maud, Ste. A
Chicago, Illinois 60614
(773) 528-1433
Fax: (773) 528-2677
Attorney No: 6293251